UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

REBECKA VIRDEN; SAMANTHA ROWLETT;
and NINA PRATER, on their own behalf and on
behalf of their minor children                                                    PLAINTIFFS

v.                                        No. 2:23-cv-2071

CRAWFORD COUNTY, ARKANSAS;
COUNTY JUDGE CHRIS KEITH in his official
capacity only; QUORUM COURT MEMBERS
ROBERT KEVIN ARNOLD, LONNIE MYERS,
MORGAN R. MORGAN, BRAD MARTIN,
MARK SHAFFER, LONNIE JENNINGS, TIA
WOODRUFF, JASON COX, CRAIG
WAHLMEIER, MITCH CAROLAN, ROGER
ATWELL, JAYSON PEPPAS, and JEFF
BEAUCHAMP in their official capacities only;
LIBRARY BOARD MEMBERS KEITH PIGG,
TAMMARA HAMBY, KALEIN SCHAPER,
KAYLA RICH, and ROBBY DYER in their
official capacities only; and LIBRARY
DIRECTOR CHARLENE McDONNOUGH in
her official capacity only                                                         DEFENDANTS

## OPINION AND ORDER

Before the Court are Plaintiffs' and Defendants' cross-motions for summary judgment
(Docs. 57, 63), as well as their various briefs, statements of facts, and notices of supplemental
authority filed in support of or opposition to these motions. *See generally* Docs. 58, 62, 64–65,
75, 79–81, 89, 95, 96-1, 103–04. For the reasons given below, Defendants' motion is DENIED,
and Plaintiffs' motion is GRANTED.

I.      **Background.**

As described in several previous opinions and orders:

According to Plaintiffs' amended complaint, in late 2022 or early 2023 the
Crawford County Library System implemented a policy under which its library
branches must remove from their children's sections all books containing LGBTQ

1

themes, affix a prominent color label to those books, and place them in a newly-created section called the "social section." Plaintiffs allege this policy was imposed on the Library System by the Crawford County Quorum Court in response to political pressure from constituents who objected, at least partly on religious grounds, to the presence of these books in the children's section. Plaintiffs and their minor children are residents of Crawford County and users of its Library System. On May 26, 2023, Plaintiffs filed this lawsuit against Crawford County, claiming that the aforementioned policy violates the First Amendment to the United States Constitution.

(Doc. 36, p. 2; Doc. 102, p. 2). Specifically, Plaintiffs' operative complaint claims that Defendants have violated their First Amendment right to receive information, and it seeks injunctive relief, asking the Court to "order the Crawford County Library System to operate in a manner consistent with the Cataloging Code of Ethics and the American Library Association's Bill of Rights." *See* Doc. 41, p. 12.

The parties have concluded the discovery process, and have filed cross-motions for summary judgment. Those motions have been fully briefed and are ripe for decision.

## II.   Legal Standard.

On a motion for summary judgment, the burden is on the moving party to show that there is no genuine dispute of material fact and that it is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56. The same standard applies to cross-motions for summary judgment, with each motion reviewed in its own right and each opposing party "entitled to the benefit of all inferences favorable to them which might reasonably be drawn from the record." *Wermager v. Cormorant Twp. Bd.*, 716 F.2d 1211, 1214 (8th Cir. 1983). Once the movant has met its burden, the non-movant must present specific facts showing a genuine dispute of material fact exists for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In order for there to be a genuine dispute of material fact, the evidence must be "such that a reasonable jury could

return a verdict for the nonmoving party." *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66–67 (8th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

### III. Discussion.

#### A. Standing.

Defendants argue, as they have several times previously in this matter, that Plaintiffs lack standing to bring their claims. To whatever extent those arguments rehash previous ones, the Court adopts and reiterates its previous rulings on these issues without further discussion here. *See* Doc. 36, pp. 5–7; Doc. 102, pp. 3–4. But there are two standing issues that Defendants have raised for the first time in their briefing on the instant motions. One is whether Plaintiffs have standing to sue the members of the Quorum Court in this matter. The other is whether Plaintiff Rowlett in particular has capacity to sue on behalf of her stepchildren.

Regarding the members of the Quorum Court, Defendants argue that they are not properly named as defendants in this matter because the Quorum Court "lacks authority to redress the injury Plaintiffs complain of." *See* Doc. 64, p. 6. Specifically, Defendants contend that the Quorum Court has no authority to oversee the operations of the County Library, and that its authority here is limited to the appropriation of funds. *See id.* at 6–7. But the Quorum Court's authority to appropriate funds is central to Plaintiffs' claims. Plaintiffs have produced uncontroverted evidence that during a December 2022 Quorum Court meeting shortly before the creation of the social section, at least one member of the Quorum Court threatened to withhold appropriations from the Library; and a member of the Quorum Court testified during his deposition that he and "probably all of" the Quorum Court's members wanted to defund the Library if its director did not find a way to satisfy constituents' concerns about books that were subsequently moved to the social section. *See* Doc. 75-4, pp. 8–9 (internally numbered as 25:17–26:5, 29:14–30:9). Thus a fact-finder could

3

reasonably infer that the social section was created in response to coercion from the Quorum Court. If creation and maintenance of the social section violates the First Amendment, then such an inference would support injunctive relief against members of the Quorum Court prohibiting them from conditioning funding on the social section's creation or maintenance. Legislative bodies have "wide latitude to attach conditions to the receipt" of funding in order to further their policy objections, but they "may not 'induce' the recipient 'to engage in activities that would themselves be unconstitutional.'" *U.S. v. Am. Library Assoc, Inc.*, 539 U.S. 194, 203 (2003) (quoting *South Dakota v. Dole*, 483 U.S. 203, 206 (1987)).

As for Ms. Rowlett, Defendants argue that although she may sue on her own behalf and two of her four minor children, she lacks capacity to sue on behalf of the other two who are her stepchildren but over whom she has not obtained a formal legal guardianship. This question is governed by Federal Rule of Civil Procedure 17, which provides that "[t]he following representatives may sue . . . on behalf of a minor . . .: (A) a general guardian; (B) a committee; (C) a conservator; or (D) a like fiduciary." Fed. R. Civ. P. 17(c)(1). Whether Ms. Rowlett is "a like fiduciary" is determined by Arkansas law. *See id.* at 17(b). This Court has not found, and neither party has cited, any Arkansas cases which directly answer this question. However, one case cited by Defendants is instructive. In *Daniel v. Spivy*, the Arkansas Supreme Court addressed whether a stepparent who had never undergone the legal formality of adopting their minor stepchild could nevertheless be awarded visitation rights with that child upon divorcing the child's biological parent. 2012 Ark. 39 at *4–*7, 386 S.W.3d 424. The *Daniel* court reaffirmed that this depends on whether the stepparent stands *in loco parentis* to the child, and that this equitable principle "refers to a person who has fully put [herself] in the situation of a lawful parent by assuming all the obligations incident to the parental relationship and who actually discharges those obligations."

*Id.* at *6.  A stepparent who has not formally adopted a minor child may satisfy this requirement, but this requires "something more" than merely furnishing necessities for and exercising some control over the child.  *See id.* at *6–*7.

The evidentiary record in this case is sparse, nearly to the point of nonexistence, on the extent to which Ms. Rowlett has assumed and discharged "all the obligations incident to the parental relationship" with respect to her two stepchildren.  The closest any testimony comes to addressing this question is Ms. Rowlett's own testimony that hers is a "blended family" and that she is a "co-parent" of her two stepchildren.  *See* Doc. 63-4, pp. 9 – 10 (internally numbered 33:23–34:21).  She was never asked during her deposition to elaborate on what she understands her co-parenting duties to entail.  *See generally* Doc. 63-4.  Nor was the topic ever explored or even mentioned during the depositions of her two stepchildren.  *See generally* Docs. 63-5, 63-6.  The evidence on this issue must be construed in the light most favorable to Ms. Rowlett, since it is raised in Defendants' summary judgment motion.  Under that standard, a fact-finder could reasonably infer from this record that Ms. Rowlett's testimony that she is a "co-parent" of her two stepchildren was meant in the literal and fullest sense; thus there is a material dispute of fact on the question whether Ms. Rowlett is "a like fiduciary" under Arkansas law and within the meaning of Rule 17(c)(1)(D).  Accordingly, Defendants are not entitled to summary judgment on this issue.

### B.     First Amendment.

The Court turns now to the merits of Plaintiffs' claims.  First, as a factual matter, the Court finds that even when the evidentiary record is construed in the light most favorable to the Defendants, it is indisputable that the creation and maintenance of the social section was motivated in substantial part by a desire to impede users' access to books containing viewpoints that are unpopular or controversial in Crawford County.  On or around November 10, 2022, Dr. Jeffrey

Hamby and Tamara Hamby sent a letter to the Quorum Court, County Judge, and County Judge-elect, expressing concern "about the agenda that is being pushed by the Van Buren Public Library, aiming education of alternative lifestyles to prepubescent children"—in particular, the "progressive woke ideology normalizing and equating homosexual and transsexual lifestyles with heterosexual family units." *See* Doc. 75-8. The letter admonished its addressees that they "are responsible for hiring people to represent the values of our community," and ultimately concluded: "We are asking you to take the steps needed to ensure that this agenda is not sponsored by our tax money." *Id.* In her deposition, Ms. Hamby explained that the agenda her letter referred to was "an agenda of nontraditional values," which include showing homosexual relationships as typical or "[t]he idea of transgender." *See* Doc. 63-12, p. 5 (internally numbered as 17:15–20:8). She further testified that she attended a December 2022 Quorum Court meeting at which this topic was discussed, and that later that same evening she met personally with the then-Library Director and told her a compromise needed to be reached because "the side that wanted the books gone was getting madder and madder and madder," and that the Library Director "was crying" and "upset" during this meeting. *See id.* at 14–15 (internally numbered as 56:15–58:22). The following month, Ms. Hamby was appointed to the Library Board and elected its Chairman, and held the latter position for one year. *See id.* at 2 (internally numbered as 7:6–7:21). She is still on the Board today. *Id.*

Another member of the Library Board, Kaelin Schaper, testified that "in response to that [December 2022 Quorum Court] meeting," the Library Director "pulled those books from the children's section, perhaps other sections, wherever they were and formed the social issues section." *See* Doc. 63-14, p. 4 (internally numbered as 13:8–13:14). When asked to elaborate on the reason for placing books in the social section, Mr. Schaper replied: "that the court and the

community considered those books inappropriate for the children's section" because they contained content "that emphasized sexuality." *See id.* (internally numbered as 13:17–14:21). But when asked whether content "emphasizing sexuality" meant "normaliz[ing] homosexual relationships," Mr. Schaper replied: "Could be other reasons. But yes to that as well." *Id.* Later in his deposition, Mr. Schaper was asked to review a children's book about two men getting married that is currently in the social section, and to opine on whether it is inappropriate for inclusion in the children's section; Mr. Schaper replied that it is inappropriate. *See id.* at 5–6 (internally numbered as 20:25–22:22). Then when asked whether it would be appropriate for inclusion in the children's section if it were identical except one of the characters getting married were changed to be a woman, Mr. Schaper replied that it would be appropriate. *Id.*

The fact that viewpoint discrimination was a substantial motive for the creation and maintenance of the social section has profound First Amendment implications. After all, "if there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989).

To be clear, there is evidence that viewpoint discrimination was not the *only* motivation for creation and maintenance of the social section. For example, there was apparently concern over at least one book housed in the adult section which contained an illustration depicting a sex act, and concern that minors should be unable to access it. *See* Doc. 75-4, p. 10 (internally numbered as 34:10–34:25). It is unquestionably true that the First Amendment permits public libraries to restrict minors' access to materials that are not age-appropriate, but while those restrictions will inevitably be content-based they must still be "viewpoint-neutral." *See, e.g.*, *GLBT Youth in Iowa Schools Task Force v. Reynolds*, 114 F.4th 660, 670 (8th Cir. 2024). In other words, for First

Amendment purposes it is one thing to restrict minors' access to sexually explicit material, but a very different thing to restrict minors' access to unpopular opinions. Here, the undisputed evidence shows that the social section was created not only for the former purpose but also for the latter, which violates the First Amendment.

Defendants offer several legal arguments for why there is no First Amendment violation here. None is persuasive. One is an argument that was already raised and rejected by this Court during earlier rounds of motion practice in this case: that Plaintiffs have no First Amendment right to receive information. The Court will not reconsider or revise its ruling on that point, and would simply refer readers to its previous order discussing that issue. *See* Doc. 36, pp. 9–12.

Another of Defendants' arguments is that the First Amendment has not been violated here because the books in question have not been removed from the Library, but rather have simply been relocated to a different area which is still accessible to all patrons. This makes no difference for purposes of the First Amendment. "Restraint on protected speech generally cannot be justified by the fact that there may be other times, places or circumstances for such expression." *Pratt v. Ind. Sch. Dist. No. 831, Forest Lake, Minn.*, 670 F.2d 771, 779 (8th Cir. 1982). When a government actor "use[s] its official power to perform an act clearly indicating that the ideas contained in [media] are unacceptable and should not be discussed or considered," then "[t]his message is not lost on" library users, "and its chilling effect is obvious." *See id.* "What is at stake is the right to receive information and to be exposed to controversial ideas—a fundamental First Amendment right." *Id.*

To avoid a finding that they have violated the First Amendment, Defendants "must establish that a substantial and reasonable governmental interest exists for interfering with [Plaintiffs'] right to receive information." *See id.* at 777. They have not done so. As already noted

numerous times above, suppressing ideas or opinions on the grounds that "certain elements of populace object" to them is not a legitimate governmental interest at all.  *See id.* at 778.

Defendants also argue that Plaintiffs' requested relief runs afoul of the principle articulated in the Supreme Court case of *United States v. American Library Association* (hereinafter "*ALA*") that "public libraries must have broad discretion to decide what material to provide to their patrons" in order "[t]o fulfill their traditional missions," and that "[a]lthough they seek to provide a wide array of information, their goal has never been to provide 'universal coverage.'"  539 U.S. at 204 (plurality opinion).  But the issue here is not whether public libraries have an obligation to provide Plaintiffs with access to all conceivable ideas and opinions; they don't, and indeed that would be practically impossible.  Rather, the issue is whether public libraries have an obligation not to stigmatize disfavored viewpoints that are already in their collection.  And as already discussed above, they do.

Finally, Defendants argue that creation and maintenance of the social section amounts to "government speech," and that therefore no First Amendment violation has occurred.  "Under the government speech doctrine, courts recognize that the First Amendment's Free Speech Clause does not impose 'a requirement of viewpoint-neutrality on government speech.'"  *GLBT Youth*, 114 F.4th at 667 (quoting *Matal v. Tam*, 582 U.S. 218, 234 (2017)).  However, the Supreme Court has not extended that doctrine to the placement and removal of books in libraries, and the Eighth Circuit has very recently declined to do so as well.  *See id.* at 667–68.

For all the foregoing reasons, then, Plaintiffs are entitled to summary judgment on their claim.  There remains the question of what injunctive relief should be awarded.  The Court believes it will be sufficient to order that the social section be eliminated and that the materials contained therein be moved to appropriate sections in general circulation without consideration of whether

the viewpoints expressed in such materials are unpopular or controversial.  The Court will further order that Defendants refrain from coercing Library staff into violating this injunction.

**IV.   Conclusion.**

IT IS THEREFORE ORDERED that Plaintiffs' motion (Doc. 57) for summary judgment is GRANTED, and Defendants' motion (Doc. 63) for summary judgment is DENIED.  Judgment will be entered contemporaneously with this order.

IT IS SO ORDERED this 30th day of September, 2024.

/s/ P. K. Holmes, III
P.K. HOLMES, III
U.S. DISTRICT JUDGE